UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JESSE ALAN WALKER,

     Plaintiff,

v.                                  Case No. 3:17cv206-MCR-HTC

MARK INCH,[1] et al.,

     Defendants.

_____/

## ORDER and
## REPORT AND RECOMMENDATION

Plaintiff Jesse Walker, proceeding *pro se*, sues Defendants[2] for injunctive relief under 42 U.S.C. § 1983.  Plaintiff alleges that a failure by the Defendants to provide him with protective management exposes him to an unreasonable risk of serious harm and violates the Eighth Amendment.

---

[1] Mark Inch succeeded Julie Jones as Secretary of the Florida Department of Corrections ("FDOC") and is automatically substituted for Jones as a Defendant pursuant to Fed. R. Civ. P. 25(d).

[2] The complaint names ten (10) FDOC employees as Defendants: (1) Mark Inch, Secretary of the FDOC; (2) Jimmy Coker, the former Warden of Santa Rosa Correctional Institution ("SRCI"); (3) Micha Neal, Assistant Warden of SRCI; (4) Susan Dove, Correctional Services Consultant at SRCI; (5) Matthew Jackson, Colonel at SRCI; (6) Anne Dittman, Correctional Services Consultant at SRCI; (7) Cliff Neel, Correctional Services Consultant at the FDOC's Central Office; (8) Curtis Greene, FDOC Central Office employee; (9) Maurice Radford, Inspector Supervisor at SRCI and (10) Kate Gustafson, Inspector at SRCI.

Before the Court are Defendants' Motion for Summary Judgment (ECF Doc. 57) and Plaintiff's response in opposition (ECF Doc. 59). The motion has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(C). After reviewing the parties' submissions, the record and the relevant law, the undersigned recommends that Defendants' Motion for Summary Judgment (ECF Doc. 57) be GRANTED IN PART and DENIED IN PART.

I.    Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the nonmoving party. *Id.* Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White*

*Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995).  Generally, the Court must view the facts in the light most favorable to the non-moving party (here, Plaintiff) and draw all reasonable inferences in favor of that party.  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009).

II.    Facts

The facts pertinent to the resolution of Defendants' Motion for Summary Judgment are drawn from Plaintiff's verified complaint[3] (ECF Doc. 1), the evidence submitted by Defendants (ECF Docs. 57-1 – 57-4) and the evidence submitted by Plaintiff (ECF Doc. 59 at 12-26).  Nevertheless, matters stated below as "facts" for purposes of summary judgment review may not be the actual facts.  *See Montoute v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997).

While housed at SRCI in March 2015, Plaintiff learned a "hit" had been placed on him by gangs within the FDOC because he cooperated with investigations conducted by various law enforcement agencies and the FDOC's Office of the Inspector General ("OIG").  ECF Doc. 57-2 at 25-26.  He requested protective management[4] ("PM") on March 31, 2015.  *Id.* at 24-27.  In April 2015, the

---

[3] *See Sammons v. Taylor*, 967 F.2d 1533, 1545 n.5 (11th Cir. 1992) ("[F]acts alleged in an inmate's sworn pleading are sufficient and . . . a separate affidavit is not necessary."); *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding specific facts pled in a sworn complaint must be considered in opposition to a motion for summary judgment).

[4] Protective management is "a special management status for the protection of inmates from other inmates in an environment as representative of that of the general population as is safely possible." Fla. Admin. Code r. 33-602.221(1)(j).

Institutional Classification Team ("ICT") at SRCI and the State Classification Office denied the request because Plaintiff was unable "to advise who he felt in fear of or who had threatened him." ECF Doc. 1 at 12; ECF Doc. 57-2 at 17, 64.

Within a week of the denial, "an inmate with a long history of assaulting other inmates was moved into [Plaintiff's] cell; that inmate, Christopher Smith . . . eventually told [Plaintiff] that the officers who moved [Smith] into [Plaintiff's] cell had told [Smith] to assault [Plaintiff] because [he is] a 'snitch[.]'" ECF Doc. 1 at 12. Plaintiff "managed to keep . . . Smith at bay by giving him snacks . . . sold at the inmate canteen." *Id*.

In May 2015, a correctional officer "began pressuring . . . Smith to assault [Plaintiff]; when that did not happen, the officer began denying [Plaintiff] meals and threatened [him] with pepper spray[.]" *Id*. Plaintiff notified his mother, who called the OIG and made a complaint. *Id*. The officer was temporarily reassigned to a different dorm but, upon his return, "he intensified his threats and eventually persuaded . . . Smith to attack [Plaintiff], at which point [Plaintiff] notified [his] dad who in turn called the OIG and the FBI's Pensacola office." *Id*. Plaintiff was moved to a different dorm shortly thereafter. *Id*. For the rest of his time on close management[5] at SRCI in 2015, Plaintiff "stayed in [his] cell as much as possible to

_____

[5] Close management is "the confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without

avoid" gang members. *Id*. at 13. The FDOC downgraded Plaintiff's custody level in August 2015 and placed him in the general prison population. *Id*.

In September 2015, Plaintiff was transferred from SRCI to Okaloosa Correctional Institution ("Okaloosa CI"). *Id*. While there, he was attacked by members of the Gangster Disciples (a gang he later formally renounced) on four (4) separate occasions and escaped serious injury each time. *Id*. at 13-15. Those attacks occurred in September, October, December and April 2016. *Id*. After the fourth attack on April 11, 2016, Plaintiff falsely claimed a knife dropped during the attack was his—a tactic he hoped would lead to him being placed in confinement and transferred to a different facility away from the Gangster Disciples at Okaloosa CI. *Id*. at 15. Plaintiff received a disciplinary report for possessing a weapon; after being found guilty of the charge, he was placed on close management and subsequently returned to SRCI. *Id*.

In November 2016, Plaintiff requested PM during a disciplinary investigation for refusing a cellmate, citing the threat posed to him by members of his former gang, the Gangster Disciples. ECF Doc. 57-2 at 17, 28-29.[6] On December 1, 2016,

---

abusing the rights and privileges of others." Fla. Admin. Code r. 33-601-800(1)(d).

[6] On November 14, 2016, Lieutenant Brandon Turner confirmed Plaintiff had renounced his affiliation to the Gangster Disciples "via the OT24 screen on CDC." ECF Doc. 57-2 at 28.

an ICT composed of Defendants Dove, Neal and Jackson held a hearing.[7]  ECF Doc.

1 at 7.  At the hearing, Plaintiff told the ICT:

> In June of 2014, I provided substantial assistance and information to Inspector Collins of the [OIG], in regard to an investigation involving several correctional officers (two of whom, then Sergeants Brooks and Simmons are also members of the Gangster Disciples).  The officers were arrested for various charges ranging from introduction of contraband into a state facility (Taylor C.I.) to conspiracy to commit murder (in September of 2013, then Sergeants Brooks and Simmons put a hit on another inmate who had provided the OIG with information about their activities, in turn that inmate was stabbed by another inmate/Gangster Disciple).

ECF Doc. 1 at 7-8; ECF Doc. 57-2 at 17.  Plaintiff informed the ICT his life was in

imminent danger because the Gangster Disciples had discovered Plaintiff provided

information to the OIG at Taylor CI and placed a "hit" on him.  ECF Doc. 1 at 8.

Plaintiff also told the ICT that, in October 2016, he formally renounced his own

"affiliation to the Gangster Disciples, and 'debriefed' to the OIG's gang-intelligence

division (providing the OIG with even more information about the gang's

membership and activities inside of the prison system and on the streets)."  *Id*.

Plaintiff asked Neal whether the ICT had contacted the OIG to determine the

validity of his statements.  *Id*.  Neal told Plaintiff: (1) "the ICT does not doubt that

---

[7] Before the hearing, Plaintiff alleges he was taken to the dorm lieutenant's office, where Dove told Plaintiff "in a loud, threatening tone that [he] better tell [his] dad to stop calling her and the other prison officials about [his] safety, or [he] would face unpleasant consequences as a result of [his] dad's phone calls."  ECF Doc. 1 at 9.  An unknown lieutenant also told Plaintiff "in a threatening manner that [he] better stop 'causing trouble' at the prison 'or else!'"  *Id.* at 10.

[his] life is in danger, however, the ICT had not, and would not be contacting the OIG in regard to [his] request for placement on PM"; (2) "if the gangs want to kill [him], there is nothing the [FDOC] can do to prevent that"; and (3) if he "had not 'snitched on everybody' they wouldn't want to kill [him]." *Id.* at 8-9.

The ICT once again recommended Plaintiff's request for PM be denied "for not being able to advise who he felt in fear of or who had threatened him." ECF Doc. 57-2 at 18, 65, 72. In mid-December 2016, Defendant Dittman adopted the recommendation and denied the request. ECF Doc. 1 at 9. The State Classification Office denied Plaintiff's appeal but recommended that he not be housed with known gang members. ECF Doc. 57-2 at 18. Plaintiff appealed the PM denial to Julie Jones, the then Secretary of the FDOC; Defendant Neel denied the appeal in January 2017. ECF Doc. 1 at 9. Defendant Greene later denied a second appeal. *Id*.

Plaintiff's father called the OIG on December 19, 2016, and indicated Plaintiff feared for his life and needed protection because of Plaintiff's "previous involvement and cooperation with investigations conducted by outside law enforcement agencies and the [OIG]." ECF Doc. 57-2 at 14. The OIG initiated an inquiry on the same day and assigned it to Defendant Gustafson. *Id*.

Gustafson interviewed Plaintiff on December 20, 2016. ECF Doc. 57-2 at 15. Plaintiff explained that "he was a 'snitch' for the local law enforcement agencies he lived near prior to entering prison" and "he also came forward with information to

the [OIG] in regards to the introduction of contraband by a correctional officer [affiliated with the Gangster Disciples] at another institution." *Id*. Plaintiff stated he had renounced his own affiliation to the Gangster Disciples but "other members of the gang found out he had cooperated with the [OIG] after the correctional officer was arrested" and put a "kill on sight" order on him. *Id*.

Plaintiff told Gustafson that on December 1, 2016, Lieutenant Gary Brown advised Plaintiff "that he needed to stop being a 'snitch' or the situation was only going to get worse." *Id*. at 15-16. However, Plaintiff conceded no witnesses or evidence corroborated the allegation against Brown and he did not file a grievance regarding the interaction. *Id*. Plaintiff advised Gustafson that at 4:50 a.m. on December 20, 2016, Officer Jonathon Gent and Sergeant Daniel Johnson searched his cell. *Id*. at 16. The correctional officers told Plaintiff "the reason for the search were 'orders from the top.'" *Id*. Gent handed Plaintiff "a blank witness statement form and instructed him to write that he was not in fear for his life against correctional staff . . . ." *Id*. Plaintiff refused to write the statement as instructed. *Id*.

Gustafson read an incident report related to the cell search. *Id*. The report indicated that on December 19, 2016, prison staff reviewed outgoing mail from Plaintiff which "indicated he was in possession of a homemade weapon to protect himself from being harmed." *Id*. at 16, 34-38. Accordingly, Colonel David Dunlap ordered staff to search Plaintiff's cell for the weapon; Dunlap "also instructed

correctional staff to attempt to obtain a written witness statement from [Plaintiff] for purposes of a protective management review." *Id.* at 16. The report noted staff did not find a weapon in Plaintiff's cell and Plaintiff "refused to provide a written statement conveying he was in fear for his life." *Id.* at 16, 34. Gustafson's review of video footage confirmed the search occurred but the conversation between Gent, Johnson and Plaintiff "could not be discerned." *Id.* at 16.

On December 22, 2016, Gustafson investigated Plaintiff's assertion that he had previously cooperated with an investigation by the OIG. *Id.* at 16-17. Gustafson determined that Plaintiff was found in possession of a cell phone in 2014 and, upon questioning, Plaintiff disclosed that he obtained the phone from a correctional officer. *Id.* at 17. The officer "was part of a criminal investigation" but "no arrest was made in the case due to the State Attorney declining to file charges for prosecution." *Id.* In addition, "[t]he investigation did not mention the subject correctional officer being a member of the Gangster Disciples." *Id.* Gustafson also reviewed Plaintiff's grievances and requests for PM in March 2015 and November 2016. *Id.* at 17-18, 23-27, 79.

On January 9, 2017, Plaintiff's father informed Gustafson he had received a letter from Plaintiff alleging that on November 7, 2016, and January 3, 2017, prison staff had attempted to give him a cellmate who is a known gang member. *Id.* at 18. Plaintiff refused the cellmate on both occasions and was given a disciplinary report

for the November 7 refusal. *Id.* at 18, 30, 45. Gustafson contacted Krystal Perkins, the Housing Officer at SRCI, regarding the November 7 and January 3 incidents. *Id.* at 18. Perkins confirmed inmate Logan Vigo was assigned to be housed with Plaintiff on both occasions. *Id.* Perkins informed Gustafson that "prior to housing [Plaintiff] and Inmate Vigo together, a check was conducted on [Corrections Data Center ("CDC")] and it was observed both inmates were of the same gang affiliation according to CDC." *Id.* Gustafson, however, checked the CDC on January 9, 2017, and found that Plaintiff was listed as a renounced member of the Gangster Disciples. *Id.* Gustafson advised Perkins of this fact and Perkins placed Plaintiff "on a no cellmate list for [SRCI]." *Id.*

On February 17, 2017, Inspector Supervisor Maurice Radford received a copy of an undated letter written by Plaintiff from Plaintiff's father. *Id.* at 18, 42-44. In the letter Plaintiff makes allegations of threats and retaliation from Sergeant Shane Carr, Lieutenant Dwight Moore, and Classification Supervisor Susan Dove. *Id.* at 18, 42-44.

On February 22, 2017, Gustafson and Inspector Mai Morris conducted another interview with Plaintiff at SRCI. *Id.* at 18. Plaintiff said Dove walked by his cell on February 10 and gave him a "dirty look." *Id.* Carr subsequently attempted to give him a cellmate who is a known Gangster Disciple. *Id.* When Plaintiff refused the cellmate, Carr threatened to impose property restrictions and take disciplinary

action against him. *Id*. Moore told Plaintiff "he was going to have disciplinary action and property restrictions placed against him" but when Plaintiff showed Moore a letter from an attorney, Moore "indicated the issue was resolved." *Id*. at 18-19.

Gustafson contacted Sergeant Carr, who confirmed he attempted to house an inmate in the cell with Plaintiff on February 10. *Id*. at 19. "Carr indicated when he arrived at [Plaintiff's cell door], [Plaintiff] stated, "I don't want him as a roommate, he's black." *Id*. Gustafson's review of video footage confirmed Carr attempted to house an unidentified black male in Plaintiff's cell. *Id*. However, the video footage did not show Lieutenant Moore speaking with Plaintiff at his cell door. *Id*.

Plaintiff also told Inspectors Gustafson and Morris he sent an informal grievance to Radford concerning the actions of Dove, Carr, and Moore. *Id*. The grievance coordinator redirected the grievance to Lieutenant Joseph Schrock "because it was a request for protection from other inmates which is normally addressed by security." *Id*. Schrock spoke with Plaintiff on February 17 and "assured him [Dove] did not take retaliatory action against" Plaintiff. *Id*. Plaintiff informed the inspectors "he believes Ms. Dove has influence over the correctional staff who may take retaliatory action against him on her behalf." *Id*. He also indicated he did not feel safe at SRCI due to Dove. *Id*.

Inspector Gustafson ended her inquiry on March 6, 2017; she found "a lack of supportive evidence, i.e., no witnesses, video record, or other documentation to support an allegation of improper conduct by staff . . . ." *Id.* at 20. Thus, Gustafson concluded "the allegations proffered by [Plaintiff and his father] to support a request that [Plaintiff] should be approved for protective management status or transferred to another institution based upon perceived improper conduct or potential retaliation by staff at [SRCI] for [Plaintiff's] participation with previous investigations are unsubstantiated."[8] *Id.*

Plaintiff filed this case on March 30, 2017. ECF Doc. 1. He seeks "a declaration that the acts and omissions described herein violated Plaintiff's rights under the Constitution and laws of the United States," a permanent injunction requiring Defendants to house him in PM, his costs and "any additional relief this court deems just, proper and equitable." *Id.* at 19. Approximately five months after filing suit, on August 29, 2017, the FDOC transferred Plaintiff away from SRCI. ECF Doc. 57-3 at 5. After stops at two other FDOC facilities, Plaintiff arrived at Hamilton Correctional Institution Annex on September 26, 2017, and was placed in

---

[8] Inexplicably, Defendants' Motion for Summary Judgment incorrectly represents that "Gustafson concluded her investigation and recommended that Plaintiff be transferred to a different institution or placed in PM." ECF Doc. 57 at 3. That Gustafson did not make such a recommendation is obvious from her report and from the fact Plaintiff did not receive a transfer or PM until the end of August 2017, over five (5) months after Gustafson's investigation ended. ECF Doc. 57-2 at 20.

PM. *Id*. He has remained in PM at various institutions and is currently confined at Columbia Correctional Institution Annex. ECF Doc. 57-4 at 23; ECF Doc. 61.

### III. Discussion

#### A. Mootness

Defendants first argue that any request by Plaintiff to be placed in PM is moot because he was placed, and has remained, in PM since September 2017. ECF Doc. 6-7. "If events that occur subsequent to the filing of a lawsuit . . . deprive the court of the ability to give the plaintiff . . . meaningful relief, then the case is moot and must be dismissed." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) (citation omitted). Nevertheless, "'[t]he doctrine of voluntary cessation provides an important exception to the general rule' of mootness." *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1351 (11th Cir. 2011) (quoting *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1282 (11th Cir. 2004)). "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)); *see also United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) ("Mere voluntary cessation of allegedly illegal conduct does not moot a case[.]"). "Otherwise, a party could moot a challenge to a practice simply by changing the

practice during the course of a lawsuit, and then reinstate the practice as soon as the litigation was brought to a close." *Jews for Jesus, Inc. v. Hillsborough Cty. Aviation Auth.*, 162 F.3d 627, 629 (11th Cir. 1998).

"[T]he voluntary cessation of challenged conduct will only moot a claim when there is no 'reasonable expectation' that the accused litigant will resume the conduct after the lawsuit is dismissed." *Bankshot*, 634 F.3d at 1351 (citing *Jews for Jesus*, 162 F.3d at 629). "Generally, the 'party asserting mootness' bears the 'heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again.'" *Id.* (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189). "[G]overnment actors receive the benefit of a rebuttable presumption that the offending behavior will not recur," *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1184 (11th Cir. 2007), but "only *after* [they have] shown unambiguous termination of the complained of activity." *Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014) (*citing Harrell v. The Fla. Bar*, 608 F.3d 1241, 1267-68 (11th Cir. 2010)) (emphasis in original). "[C]ourts are more likely to find that the challenged behavior is not reasonably likely to recur where it constituted an isolated incident, was unintentional, or was at least engaged in reluctantly." *Sheely*, 505 F.3d at 1184.

Here, Defendants have not established unambiguous termination of the challenged conduct. Defendants have not addressed the doctrine of voluntary cessation and have not given any assurances that Plaintiff will not be removed from

PM and returned to the general prison population in the future. *See Doe*, 747 F.3d at 1324 ("The mere fact that the BOP transferred Mr. Doe to the Colorado State Corrections system simply does not show that the BOP has unambiguously terminated its pattern of transferring Mr. Doe to one high-security prison after another. We note that the BOP has never said Mr. Doe will not be transferred back to a high-security facility."); *Hall v. Bd. of Sch. Comm'rs of Conecuh Cty.*, 656 F.2d 999, 1001 (5th Cir. Unit B 1981) (to defeat jurisdiction based on voluntary cessation, "defendants must offer more than their mere profession that the conduct has ceased and will not be revived") (citations omitted); *Hardwick v. Brinson*, 523 F.2d 798, 800 (5th Cir. 1975) ("[C]ounsel for defendants were unable to advise that appellant would not be returned to the Reidsville Prison. Thus the same alleged conduct which appellant complains of may recur.").

Additionally, as Plaintiff notes, the FDOC's regulations provide that placement in PM is intended to be temporary and he could be removed from it at any time. *See* Fla. Admin. Code r. 33-602.221(8)(a) ("The Institutional Classification Team shall review inmates in protective management every week for the first 60 days. The goal shall be toward returning the inmate to general population as soon as the facts of the case indicate that this can be done safely."); *id.* at 8(d) ("The State Classification Office (SCO) shall review all reports prepared by the ICT concerning an inmates protective management and may interview the inmate before determining

the final disposition of the inmate's protective management status.  However, the State Classification Office shall conduct an onsite interview with each inmate at least once every six months or as often as necessary to determine if continuation, modification, or removal from protective management status is appropriate.").  The temporary nature of Plaintiff's PM status supports a finding that this case is not moot. *See Doe*, 747 F.3d at 1324 (finding transfer to state prison did not moot Doe's claim against defendant BOP because "Mr. Doe's assignment to a state facility [was] not permanent and [was] subject to review every two years.").

Moreover, Defendants have failed to explain why Plaintiff's request for PM was denied in December 2016 but granted in September 2017, after he filed this case.[9]  *See id.* at 1322-23 (noting "[i]n conducting both the initial inquiry of unambiguous termination as well as the following evaluation about whether there is a reasonable basis the challenged conduct will recur" the Court considers "'whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction'") (quoting *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 532 (11th Cir. 2013)); *Harrell*, 608 F.3d at

_____

[9] In support of their Motion to Dismiss as Moot (ECF Doc. 32), Defendants submitted evidence indicating the ICT at Hamilton CI recommended approval of the PM request because "on November 11, 2016, [Plaintiff] provided vital information to the [Security Threat Groups] Sergeant regarding the operations and rules of the Gangster Discipl[es], and the vital intelligence provided by him created a viable threat to his safety."  ECF Doc. 32-1 at 2.  Plaintiff, however, was not placed in PM in December 2016 despite telling the ICT at SRCI that he had supplied information about the Gangster Disciples to FDOC personnel.

1266 ("the 'timing and content' of a voluntary decision to cease a challenged activity are critical in determining the motive for the cessation").

Thus, the relief sought by Plaintiff, a permanent injunction requiring the FDOC to keep him in PM until the expiration of his sentence, is not moot.  *See LaMarca v. Turner*, 995 F.2d 1526, 1541 (11th Cir. 1993) ("When a defendant corrects the alleged infirmity after suit has been filed, a court may nevertheless grant injunctive relief unless the defendant shows that absent an injunction, the institution would not return to its former, unconstitutionally deficient state.") (citation omitted).

In a related argument, Defendants contend "Plaintiff's claims are not ripe for judicial review" because "Plaintiff is now on PM and did not suffer any injury prior to his placement on PM."  ECF Doc. 57 at 12-13.  Plaintiff, however, alleges that if he is removed from PM, he may be subjected to attacks by gang members, which is sufficient to satisfy Article III's case or controversy requirement.  *See Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (An inmate "does not have to await the consummation of threatened injury to obtain preventive relief.") (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)); *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) ("To invoke the jurisdiction of a federal court, a litigant must have suffered, *or be threatened with*, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision[.]") (emphasis added) (citations omitted).  The undersigned, thus, finds that Defendants are not

entitled to summary judgment on the ground that the Plaintiff's claim is moot or not ripe.

      B.     Redundant Defendants

Defendants next argue that, except for the Secretary of the FDOC, every Defendant should be dismissed because they cannot provide Plaintiff with his requested relief and are redundant to the Secretary. ECF Doc. 57 at 7-10. The Court previously recognized Plaintiff is suing Defendants in their official capacities. ECF Doc. 44 at 1. "In contrast to individual capacity suits, when an officer is sued under Section 1983 in his or her official capacity, the suit is simply 'another way of pleading an action against an entity of which an officer is an agent.'" *Busby v. City of Orlando*, 931 F.2d 764, 776 (11ᵗʰ Cir. 1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). The FDOC, therefore, is treated as the Defendant in this case.

The presence of Secretary Inch as a Defendant in this case makes the inclusion of the remaining nine (9) Defendants unnecessary.[10] *See id.* (affirming "the district

---

[10] Plaintiff argues dismissal of the nine (9) Defendants is inappropriate because he wants a declaration that every Defendant's acts were unconstitutional. ECF Doc. 59 at 4, 7. Plaintiff, however, may not seek declaratory relief to adjudicate the legality of past conduct. *See Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1337 (11ᵗʰ Cir. 1999) ("a plaintiff may not use the [*Ex parte Young*] doctrine to adjudicate the legality of past conduct") (citation omitted); *Jones v. Buckner*, 963 F. Supp. 2d 1267, 1283 (N.D. Ala. 2013) ("Although *Ex parte Young* allows declaratory relief, it does not apply when the declaratory relief pertains only to past violations of federal law.") (citing *Green v. Mansour*, 474 U.S. 64, 73 (1985)). Moreover, to the extent he seeks relief against these Defendants to keep them from removing him from PM in the future, as employees of the FDOC, they would be bound by any injunction imposed by this Court without being named parties.

court's decision to grant a directed verdict in favor of Walsh, Mays, Paden, and Noble as officially named defendants, because the City of Orlando remained as a defendant" and "[t]o keep both the City and the officers sued in their official capacity as defendants in this case would have been redundant and possibly confusing to the jury"); *M.R. v. Bd. of Sch. Comm'rs of Mobile Cty.*, Civil Action No. 11-0245-WS-C, 2012 WL 2931263, at *2 (S.D. Ala. July 18, 2012) ("[C]ourts in [the Eleventh] Circuit routinely and overwhelmingly deem suits against both a local government official in his official capacity and the entity of which the officer is an agent to be redundant, and dismiss the official-capacity claims against the individual defendant on that basis.").  Furthermore, an order enjoining the Secretary of the FDOC from removing Plaintiff from PM would bind the other FDOC employees named as Defendants.  *See M.R.*, 2012 WL 2931263, at *4 ("[I]f plaintiffs successfully obtain a prospective injunction barring the Board from implementing a custom or policy of imposing long-term suspensions of MCPS students without prior notice and hearing, then imposition of a similar injunction against the Individual Defendants in their official capacities would gain precisely nothing for plaintiffs, but would simply reiterate the injunction against the Board.").  Thus, the undersigned finds that summary judgment should be entered in favor of the individually named Defendants, other than Inch.

C.    Failure to State a Claim

Defendants assert Plaintiff cannot state a cognizable claim against Secretary Inch because: (1) Plaintiff claims "he should be placed on [PM] merely because he has cooperated with law enforcement agencies related to criminal activities"; (2) "[t]he decision on whether to place an inmate on a specific custody status is clearly within the delegated functions of FDOC as an Executive Branch Agency" and (3) "[t]here is no constitutional right to a placement on a custody status within FDOC, and failure to classify him within such a division does not violate any constitutional right."[11]  ECF Doc. 57 at 11-12.  The undersigned disagrees.

First, Defendants have mischaracterized the nature of Plaintiff's claim. Plaintiff does not allege he should be in PM "merely" because he cooperated with investigations.  Instead, he says gang members learned he cooperated, attacked him because he cooperated and, if he does not remain in PM, will attack him in the future.

Second, although an inmate generally has no constitutional right to placement in a particular prison or custody level, *see Wyatt v. Martin*, Civil Action No. 2:08cv398-TMH, 2008 WL 3075129, at *2 (M.D. Ala. Aug. 1, 2008) ("Plaintiff has no constitutionally protected interest in the level of his custody classification and correctional officials may, therefore, assign him to any classification level without

---

[11] Defendants also argue Plaintiff cannot state a claim against Defendants Greene, Neel, Gustafson, and Radford.  ECF Doc. 57 at 10-11.  Because these Defendants should be dismissed as redundant to Defendant Inch, the undersigned will address only Defendants' argument regarding Inch.

implicating the protections of due process."), Plaintiff is not making an abstract claim that he is entitled to a particular custody classification.  Instead, he is arguing that if the FDOC denies him PM he will be exposed to a substantial risk of serious harm in violation of the Eighth Amendment.  *See Farmer*, 511 U.S. at 828 ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment.") (citations omitted); *see also Montanye v. Haymes*, 427 U.S. 236, 242 (1976) ("As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him *and is not otherwise violative of the Constitution*, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.") (emphasis added).  Because inmates can pursue injunctive relief to remedy or avoid conditions of confinement which violate the Eighth Amendment, Plaintiff's official capacity claim should proceed against Secretary Inch.

IV.    Conclusion

Accordingly, it is ORDERED:

1.    The clerk is directed to update the docket to reflect that Mark Inch has succeeded Julie Jones as the Secretary of the FDOC.

And it is respectfully RECOMMENDED:

1.    That Defendants' Motion for Summary Judgment (ECF Doc. 57) be GRANTED as to Defendants Jimmy Coker, Micha Neal, Susan Dove, Mathew

Jackson, Anne Dittman, Cliff Neel, Curtis Greene, Maurice Radford and Kate Gustafson, and DENIED as to Defendant Mark Inch, as Secretary of the FDOC.

2.     That this matter be referred to the undersigned for further pretrial proceedings on Plaintiff's official capacity Eighth Amendment claim against Defendant Inch.

At Pensacola, Florida, this 10th day of May, 2019.


*/s/ Hope Thai Cannon*_____
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**


NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  A copy of objections shall be served upon the Magistrate Judge and all other parties. A party failing to object to a Magistrate Judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.